Filed 6/24/15  P. v. Morales CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067486 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI901806) |
| MARTIN ROLAND MORALES et al., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Affirmed as modified.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Martin Roland Morales.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Santo-Herrera.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant Crystal Rodriguez.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Martin Roland Morales of two counts of torture (Pen. Code,[1] § 206; counts 1 & 4); two counts of corporal injury to a child (§ 273d, subd. (a); counts 2 & 5); sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); count 3). The jury also found true the special allegations that Morales personally inflicted great bodily injury upon the victims in the commission of the corporal injury offenses. (§ 12022.7, subd. (a); counts 2 & 5.)

Morales admitted a prior strike conviction. (§ 667, subds. (b)- (i).)

The jury also convicted Carlos Santos-Herrera of torture (§ 206; count 6); corporal injury to a child (§ 273d, subd. (a); count 7); and sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); count 8).

In addition, the jury convicted Crystal Rodriguez of child abuse. (§ 273a, subd. (a); count 9.)

The court sentenced Morales to prison for 78 years to life consisting of 14 years to life for count 1; a consecutive term of 50 years to life for count 3; and a consecutive term of 14 years to life for count 4. The court also imposed the upper term of 12 years for counts 2 and 5 and three years for each of the injury enhancements and stayed those sentences pursuant to section 654.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

The court sentenced Santos-Herrera to prison for 32 years to life consisting of seven years to life for count 6 and a consecutive indeterminate sentence of 25 years to life for count 8. The court also imposed the upper term of six years for count 7 and stayed that sentence under section 654.

The trial court sentenced Rodriguez to four years for count 9.

Under section 1202.05, the court ordered that Morales and Santos-Herrera were prohibited from visiting with any of the victims.

All three defendants appeal. Morales contends: (1) substantial evidence does not support his conviction under count 3; (2) the court erred by failing to sua sponte instruct the jury regarding attempted sodomy; (3) the prosecutor committed prejudicial misconduct during closing argument; (4) the order prohibiting visitation must be stricken; and (5) cumulative error warrants reversal.

Santos-Herrera argues: (a) substantial evidence does not support his conviction under count 8; and (b) he was prejudiced by the admission of evidence regarding child sexual abuse accommodation syndrome (CSAAS).

Rodriguez maintains the trial court erred in its responses to the jury's questions for further clarification regarding her duress defense.

Each appellant joins in the other appellants' respective arguments.

We agree that the orders prohibiting visitation must be stricken. In all other respects, we affirm the judgment.

FACTUAL BACKGROUND

This case concerns the abuse and torture of minors, J. and R. During the time at issue, R. was 12 year's old. He is the son of Morales and Rodriguez. J. and his mother lived with Morales, Rodriguez, and their nine children (including R.) in a house in Apple Valley. Santos-Herrera, Jose Cervantes, and Ismael Frias[2] also lived at the Apple Valley residence.

Because neither Morales nor Santos-Herrera challenge their convictions for torture and corporal injury, we are spared from having to discuss in detail the sickening treatment of the poor victims. Suffice it to say, Dr. Amy Young, a child abuse physician and the associate medical director of the Children's Assessment Center of San Bernardino (CAC), who examined J., testified that out of the thousands of child abuse victims she had examined, J. was one of the worst cases she had ever seen. Although R.'s injuries were not as severe and his treatment in the Apple Valley residence less horrific, he too had multiple injuries consistent with abuse.

Morales and Santos-Herrera, however, challenge the sufficiency of the evidence supporting their respective convictions for sodomy. Thus, we will discuss the pertinent facts below when we address their substantial evidence challenge.

---

[2]     Apparently, Cervantes and Frias also took part in the abuse of Johnny. They were not tried with the three appellants here.

DISCUSSION

I

*COUNTS 3 AND 8*

Appellants[3] contend substantial evidence does not support their respective convictions for sodomy of a child 10 years of age or younger (§ 288.7, subd. (a); count 3 (Morales) and count 8 (Santos-Herrera)). Additionally, appellants maintain the trial court erred by allowing the prosecution to present evidence regarding CSAAS. Finally, they argue the trial court erred by failing to instruct the jury with the lesser included offense of attempted sodomy. We reject these contentions.

A. Substantial Evidence

*1. Evidence Relating to Sodomy Offenses*

Sheriff deputies interviewed J. twice. Although he detailed the physical abuse he endured, he did not mention anything about being touched sexually by Morales or Santos-Herrera during these interviews.

During his medical examination, J. did not tell Dr. Young that he had been sodomized or touched sexually in any way. In addition, Dr. Young did not find any evidence of sexual abuse when she examined J.

J. also was interviewed by a worker at CAC with Detective Roxanne Bessinger observing. During this third interview, J. reported that Morales, Santos-Herrera, and Frias "put their wieners in his butt" and Frias also inserted his penis in J.'s mouth.

---

[3]    Rodriguez joined both Morales's and Santos-Herrera's arguments, but, as she was not convicted of sodomy, these arguments do not apply to her.

Almost six weeks after his third interview, J. identified Santos-Herrera from a photo. At that time, J. told Bessinger that Santos-Herrera "put his wiener in [J.'s] butt."

After Cervantes and Santos-Herrera were arrested, Santos-Herrera's probation officer requested that Cervantes call Morales. Cervantes did so and told Morales that he got away from the police and asked Morales to pick him up. Morales replied that he was not going to pick up Cervantes. Morales told Cervantes that he was scared because he thought the authorities were going to catch him soon. Morales expressed fear of what "homies in jail" would do to him because of what he did to J. and because he would be facing child abuse and child molestation charges. Cervantes explained to his probation officer that "homies" were the Surenos (Mexican gang members from Southern California) and that child molestation was a "green light" for anyone to attack or hurt Morales because of child molestation charges.

Three weeks before trial, J. told the prosecutor that neither Santos-Herrera nor Frias had done anything to him.

At trial, J. testified that nobody put his "private" in his "bottom." J. could not remember telling the CAC interviewer that Morales, Santos-Herrera, and Frias "put their wiener[s] in [his] butt."

Morales called J. as a defense witness. J. testified he was telling the truth when he testified earlier in the prosecution's case-in-chief that Morales was not mean to him, did not do mean things to him, and did not hurt him.

6

## 2. *Standard of Review*

The standard of review for a sufficiency of the evidence claim is well established. We review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) "[T]he substantial evidence rule does not require that the evidence supporting defendant's conviction be direct evidence. For purposes of the rule, substantial evidence encompasses circumstantial evidence and any reasonable inferences to be drawn from such evidence." (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069-1070; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our assessment is highly deferential to the verdict in that we presume every supporting fact the jury could have reasonably deduced from the evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) A reversal is not warranted unless the evidence is insufficient to support the verdict under any hypothesis. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

Under a substantial evidence review, it is not the province of this court to reweigh evidence or reassess a witness's credibility. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact

7

finder." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*); see *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508 (*Rasmuson*) ["The testimony of one witness, if believed, may be sufficient to prove any fact."].)

### 3. Analysis

Here, appellants insist substantial evidence does not support Morales's conviction under count 3 and Santos-Herrera's conviction under count 8 for sodomy. "Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." (§ 286, subd. (a); *People v. Harrison* (1989) 48 Ca1.3d 321, 329.)

We are satisfied that substantial evidence supports the sodomy convictions. Bessinger testified that J. disclosed to the CAC interviewer that Morales, Santos-Herrera, and Frias "put their wieners in his butt." J.'s statement was clear and unambiguous. The testimony of a single witness is sufficient to support a conviction. (*Young*, *supra*, 34 Ca1.4th at p. 1181; *Rasmuson*, *supra*, 145 Cal.App.4th at p. 1508.) J.'s statement alone, as recounted by Bessinger at trial, is sufficient to support Morales's and Santos-Herrera's sodomy convictions.

In addition, other evidence supports the sodomy convictions. Cervantes testified that during a telephone call, Morales expressed fear of what other Mexican gang

8

members in jail would do to him because of what he did to J. and because he would be facing child abuse and child molestation charges. At trial, Cervantes explained that everyone has a "green light" to attack a child molester. Morales's anticipation of child molestation charges and fear for his life in prison reasonably could have been interpreted by the jury as a tacit admission of guilt of sexually abusing J. Thus, Cervantes's testimony also supports Morales's sodomy conviction.

Appellants, however, maintain the evidence falls short of supporting the jury's verdicts as to counts 3 and 8. They argue that J.'s description of what occurred was ambiguous and does not show that they penetrated his anus. They point out that J. did not report any sexual abuse in his first interview and the medical doctor found no signs of sexual abuse. They also insist that J.'s statements during trial that he was not sexually abused further undermine the verdicts on counts 3 and 8. We are not persuaded.

As a threshold matter, appellants' arguments merely go to the weight of the evidence. They essentially ask us to compare J.'s statement against evidence they believe shows sodomy did not occur. However, we cannot reweigh the evidence. (See *People v. Lindberg*, *supra*, 45 Cal.4th at p. 27.) Nor will we substitute our evaluation regarding J.'s credibility for the jury's assessment. (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1078.)

The fact that J. did not report the sexual abuse in an earlier interview and recanted his statement that it did occur merely created a question for the jury to decide what to believe. Moreover, the prosecution provided an explanation for J.'s hesitation to report

9

the sexual abuse or discuss it after he disclosed it.[4]  There is no indication in the record that the jury did not properly consider all the evidence in deciding what to believe.  In short, we have no basis to question the jury's conclusion.

Further, although Dr. Young did not find any sign of sexual abuse during her examination of J., her finding does not negate the commission of sodomy.  She explained that genitals heal very quickly and that the redness, irritation, or injury that may have been there could be gone by the time a physical examination is conducted.  She testified that "the design [of the anus] is such that it's muscular, and it's meant to dilate, to pass large stool without causing injury to the body."  She added that "[o]ften in cases where there has been sodomy, you won't see any injury."  Also, Dr. Young explained that she conducted only a visual examination of J.'s anus and did not perform any tests to determine whether he might have had tears inside his rectum.  She testified it was possible that J. had tears in his rectum and she did not know about them.

In summary, evidence was presented that J. told the CAC interviewer that Morales, Santos-Herrera, and Frias "put their wieners in his butt."  This statement is clear.  The jury was entitled to believe it against the other evidence presented.  Both Morales and Santos-Herrera had the opportunity to convince the jury otherwise.  We are not permitted to second guess the jury on this factual determination.  The fact that evidence exists that might support an opposite conclusion is not of the moment.  (See *People v. Nelson*, *supra*, 51 Cal.4th at p. 210.)  J.'s statement to the CAC interviewer is

---

4       In addition to the CSAAS evidence, the prosecution presented evidence that J. was hesitant to tell what had happened because he did not want to be called a "snitch."

10

sufficient to support the verdicts on counts 3 and 8.  (See *Young*, *supra*, 34 Ca1.4th at p. 1181; *Rasmuson*, *supra*, 145 Cal.App.4th at p. 1508.)

## B.  CSAAS

Appellants next contend their due process rights to a fair trial were violated when the trial court allowed Bessinger to answer hypothetical questions tailored to fit the facts of this case regarding CSAAS.  We are not persuaded.

CSAAS testimony is admissible for the purpose of disabusing a jury of misconceptions it might hold about how child victims react to sexual abuse.  (*People v. McAlpin* (1991) 53 Ca1.3d 1289, 1300-1301 (*McAlpin*); *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 (*Patino*).)  To safeguard against improper use of CSAAS evidence, an expert's testimony must be addressed to specific myths or misconceptions suggested by the evidence that is before the jury.  (*People v. Housley* (1992) 6 Cal.App.4th 947, 955 (*Housley*).)  Additionally, if requested, the trial court must instruct the jury that such testimony is not proof the victim's allegations are true, and is admissible only for the purpose of showing that the victim's behavior was not necessarily inconsistent with conduct normally exhibited by someone who has been molested.  (*Ibid*.)

A prosecutor need not identify the myth or misconception by expressly stating on the record the evidence that is inconsistent with the finding of sexual abuse.  "It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation."  (*Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745.)

The admissibility of CSAAS evidence is ultimately subject to the discretion of the trial court, and its decision to admit or exclude the expert testimony "will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*McAlpin*, *supra*, 53 Cal.3d at p. 1299.)

At the outset, we note that Santos-Herrera raises the challenge to the CSAAS evidence admitted at trial. Morales merely joins the argument. Lacking in Santos-Herrera's opening brief, however, is any citation to the record where inappropriate hypothetical questions were asked. It is the appellant's duty to support arguments in his or her briefs by references to the record on appeal, including citations to specific pages in the record. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 (*Duarte*).) Here, appellants leave this court to scour the record in search of the inappropriate hypothetical questions. This is not our role. "We are not bound to develop appellants' argument for them." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

In his reply brief, Santos-Herrera attempts to correct his mistake and cites to the record purportedly to support his argument that the prosecution asked hypothetical questions mirroring the facts of this case. However, he only cites to a single page where the prosecution was asking any questions. Those questions concerned the five categories of behavior (secrecy, helplessness, entrapment and accommodation, delayed or unconvincing disclosure, and retraction) of children who are victims of sexual abuse. None of the questions the prosecution asked in the portion cited by Santos-Herrera mentioned any hypotheticals or facts related to the case. The rest of the portion of the

transcript cited by Santos-Herrera refers to questions asked by Morales's or Santos-Herrera's trial counsel. As such, appellants have not shown, with citations to the record, where the prosecution asked improper hypothetical questions. As such, we deem this argument waived. (See *Duarte*, *supra*, 72 Cal.App.4th at p. 856.)

Moreover, we would not reach a different result if we addressed the issue on the merits. Bessinger testified that J. did not disclose that Morales and Santos-Herrera "put their wieners in his butt" until the CAC interview about a month after the authorities found him at the Apple Valley residence. At trial, J. denied that Morales or Santos-Herrera sodomized him. Given J.'s delayed disclosure and retraction of his statement at trial, the trial court properly admitted the CSAAS evidence to dispel any misconception about how child victims react to sexual abuse. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301; *Patino*, *supra*, 26 Cal.App.4th at p. 1744.)

In addition, Bessinger did not testify how J.'s behavior in this case could be assessed according to CSAAS. Instead, Bessinger's testimony about CSAAS was general and was not described with particular focus on J.'s behavior in this case.

The prosecutor's questions were limited to Bessinger's discussions of child victims as a class, as supported by her references to literature and experience. The prosecutor asked Bessinger only general questions about the five behavioral aspects of CSAAS. The prosecutor never asked her any fact-specific hypotheticals about J., his circumstances, or his behavior. Nor did the prosecutor seek or elicit Bessinger's opinion as to whether J. was sodomized. On this record, we are satisfied the court did not abuse its discretion in admitting Bessinger's testimony about CSAAS.

13

C. Jury Instruction Regarding Lesser Included Offense of Attempted Sodomy

Appellants also argue that the trial court committed prejudicial error when it failed to instruct the jury regarding the lesser included offense of attempted sodomy. We disagree.

The law governing a trial court's duty to instruct the jury on lesser included offenses, and the standard of review that this court applies in reviewing a trial court's decision regarding whether to give such an instruction, are well established:

> "Instructions on lesser included offenses must be given when there is substantial evidence for a jury to conclude the defendant is guilty of the lesser offense but not the charged offense. [Citations.] Substantial evidence is defined for this purpose as 'evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.] 'In deciding whether evidence is "substantial" in this context, a court determines only its bare legal sufficiency, not its weight.' [Citation.] The trial court's decision whether or not the substantial evidence test was met is reviewed on appeal under an independent or de novo standard of review." (*People v. Garcia* (2008) 162 Cal.App.4th 18, 24-25.)

Appellants argue there existed substantial evidence to support the giving of an instruction on attempted sodomy. However, they do not point to any evidence that would support a conviction for attempted sodomy. Instead, they argue that the evidence of sodomy was weak, including the testimony of Young where she stated a child does not understand anatomy and might not understand "inside" in the same manner that an adult would. Yet, absent in the record is any evidence that appellants attempted to sodomize J., but were unsuccessful.

In their reply briefs, appellants rely on *People v. Ngo* (2014) 225 Cal.App.4th 126 (*Ngo*). Their reliance is misplaced.

14

In *Ngo*, the court found that the trial court had a sua sponte duty to instruct the jury on attempted sexual penetration with a child, as a lesser included offense. (*Ngo*, *supra*, 225 Cal.App.4th at pp. 155-157.) In her initial statements to the police, the victim stated that the defendant touched her, but she was equivocal as to whether he actually penetrated her. (*Id*. at p. 157.) The victim's mother testified that she interrupted the defendant's touching of the victim when she walked into the living room, but she did not see whether he penetrated her. (*Ibid*.) The defendant admitted touching the victim, but denied that he penetrated her. (*Ibid*.) The court found that the evidence was consistent with "the possibility that [the] defendant attempted to penetrate [the victim], but that Mother interrupted the attempt when she walked into the room." (*Ibid*.) The court concluded that a reasonable jury could find this evidence persuasive as to attempted sexual penetration; thus the court had a sua sponte duty to instruct the jury accordingly. (*Ibid*.)

In contrast to *Ngo*, there was no such substantial evidence of attempted penetration in the instant case. Specifically, the defendant in *Ngo* admitted touching the victim, but denied that he penetrated her. (*Ngo*, *supra*, 225 Cal.App.4th at p. 157.) The mother and the victim also stated that the defendant touched the victim, but were not sure whether defendant penetrated her. (*Ibid*.) Unlike *Ngo*, appellants denied touching J. in a sexual way at all. Moreover, J. told the CAC interviewer that Morales, Santos-Herrera, and Frias "put their wieners in his butt." *Ngo* is not instructive here.

Simply, there was no evidence whatsoever to support a jury instruction for the lesser included offense of attempted sodomy. No argument was made to the jury that

15

Morales and/or Santos-Herrera merely put their respective penises near J.'s anus, but did not penetrate it. Indeed, Morales and Santos-Herrera never conceded at trial that they touched J. in any way. Instead, they argued that they did not touch J. in a sexual manner.

II

*PROSECUTORIAL MISCONDUCT*

Appellants maintain that their sodomy convictions should be reversed because the prosecutor committed misconduct during closing argument. Specifically, they contend the prosecutor argued facts that were not in evidence and vouched for a witness. We disagree.

A. Background

During closing argument, Santos-Herrera's trial counsel accused the prosecution of coaching J. This was a major theme of the closing:

> "Now [the prosecutor] comes to you and asks you to accept J.'s version of the facts as relayed. I know I'm beating a dead horse, but this is a dead horse that has to be beat for a minute. That is just offensive. It's offensive that he's trying to perpetrate this fraud upon all of you in getting you to accept as true a videotaped interview that he chose not to show you; right? We will get to -- actually, that's my next note.
>
> [¶] . . . [¶]
>
> ". . . Let's get to the heart of the issue here; right? A little thing called coaching. We know from J. that he's been in the DA's Office. He told most definitely three weeks ago.
>
> "Pretty amazing how a kid in only second grade can tell us what the answer to 12 times 12 is. I was shocked because I had to pull out a calculator. I went to California public school. I'm not so good with math. I thought, did that kid just get that right? He did. Of course,

16

he got nine times ten right. I figured that one out on my own. I was amazed at that.

"Over the lunch hour, I thought to myself, how did a second-grader do that? I thought that California public schools, they're teaching kids higher level math, multiplication, second grade. So I asked the kid, what's 11 times 11? He told us it was 22. I said, are you sure? He said, no, it's 11. Are you sure? No, it's 22. I said, okay. Very good. I didn't want to make the kid feel bad or pick on him. His answers to 11 times 11 settled that, 11 and 22. Then the next math question, it was eight times nine. He missed that one too.

"So that gave me the confidence to just come right out and ask the kid, did [the prosecutor] tell you what math problems he was going to give you here in court and give you the answers? Yep, he told me the math problems. I have a thing at home, and I figured them out, but he told me. We call that coaching. That's coaching a witness. [¶] . . . [¶] It was a serious part in demonstrating to the court that the witness told us, yeah, [the prosecutor] coached -- [the prosecutor] told me the questions he was going to ask. So I had time to have my answers ready. Tricky, folks. Plain and simple, tricky. It's a magic show; right?"

In rebuttal argument, the prosecutor addressed the accusations that he coached J.:

"Defense attorney for [Santos-Herrera] makes a big deal about the fact that a few weeks before trial J. kind of blurted out to me, [Santos-Herrera] and [Frias] did not do anything to me. Well, we know that's not true because we know [Frias] did stuff to J. Even [Frias] confessed to burning and beating J. So you can reasonably conclude that the reason J. said that is he knows he's coming up for trial, and he doesn't want to testify. He's scared to death to testify. He wants to say, they didn't do anything.

"I will say the one somewhat truthful thing that defense attorney mentioned was his client, [Santos-Herrera], was liked more by J. than Defendant Morales, at least he said, he's my friend or something like that. Compared to Morales, [Santos-Herrera] is a better guy. [Santos-Herrera] didn't abuse him as much as J. -- as Morales did. So compared to [Morales], [Santos-Herrera] is something of a lightweight. He's still guilty, but he's not quite as bad.

17

"You also -- defense attorney also tried to make it look like I was coaching J. If you remember what J. said when I asked him, I said, J., have you and I ever sat down and reviewed the whole case, showed you police reports, reviewed all the facts? He said, no. That was true.

"Now, that's not usually the way it goes. Usually the prosecutor would sit down with the victim and go over the police reports with an officer present in case the victim blurts out something. I didn't do that in this case because I didn't want the defense attorney to falsely accuse me of coaching the victim. Of course, he falsely accused me of that anyway."

Santos-Herrera's trial counsel objected to the prosecutor's argument on the ground that the prosecutor stated facts that were not in evidence. Morales's trial counsel objected on the ground that the prosecutor was testifying. The trial court overruled the objections.

The prosecutor continued responding to the accusations that he coached J. as follows: "J. did testify that we never sat down and discussed a full interview of the case. So despite that, I get accused of coaching him. When, in fact, according to the evidence, I never sat down and reviewed all the facts with J."

## B. Law

"Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.)

" '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include

18

reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] . . . [¶] . . . '. . . A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.' " (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.)

However, "[a] prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Espinoza* (1992) 3 Cal.4th 806, 820; *People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Also, a prosecutor may not vouch for the credibility of a witness by referring to evidence outside the record, or by invoking the prestige or reputation of the district attorney's office. (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)

### C. Analysis

Taken out of context, as presented in Santos-Herrera's opening brief, the prosecutor's comments are problematic. He did discuss witness preparation, outside the court meetings with the witness, and his usual witness preparation. However, here, these

19

comments do not constitute prosecutorial misconduct because they were properly made as rebuttal argument. In *People v. McDaniel* (1976) 16 Cal.3d 156, the defendant complained that during closing argument the prosecutor committed misconduct by improperly attempting to shift the burden of proof to the defendant. The court concluded that "there is no misconduct and note[d], moreover, that even otherwise prejudicial prosecutorial argument, when made within proper limits in rebuttal to arguments of defense counsel, do not constitute misconduct." (*Id.* at p. 177.)

In *People v. Mendibles* (1988) 199 Cal.App.3d 1277 (*Mendibles*), defense counsel improperly implied during closing argument that the prosecutor had influenced the victims' testimony by coaching them, and the victims had lied throughout the trial. In response, the prosecutor attempted to explain to the jury that there had not been any improper coaching of any witness. Rather, the court had ruled that certain topics were not to be mentioned on the witness stand and this was conveyed to the witnesses. The defendant complained that such comments by the prosecutor constituted prosecutorial misconduct because the prosecutor informed the jury by innuendo that the court had kept evidence of the defendant's guilt from the jury. (*Id.* at pp. 1312-1313.)

The court concluded there was no prosecutorial misconduct because the prosecutor's comments constituted appropriate rebuttal argument. (*Mendibles*, *supra*, 199 Cal.App.3d at p. 1313.) The court stated that, "Given the highly inflammatory implications of defense counsel's argument, unequivocally impugning the integrity of the prosecution, the above rebuttal remarks were 'fairly responsive to argument of defense counsel and [were] based on the record.' [Citation.] In these circumstances, the

20

prosecutor 'cannot be charged with misconduct if his comments only spill over somewhat into a forbidden area; the departure from propriety must be a substantial one.' " (*Ibid*.)

In determining whether there has been a substantial departure from propriety, the key consideration "is whether there is any undue advantage to the People or disadvantage to the defendant. This is determined by inquiring whether the response was intended or formed to invite the jury to draw adverse inferences, was unduly emphasized and related to central or peripheral areas of determinant factors concerning the defendant's guilt or innocence." (*Mendibles*, *supra,* 199 Cal.App.3d at p. 1313.)

Here, during closing argument, Santos-Herrera's trial counsel opened the door to the prosecutor's rebuttal argument regarding how the prosecutor prepared J. for trial. Indeed, defense counsel explicitly accused the prosecutor of attempting to "perpetrate [a] fraud" and "coaching" J. These accusations warranted a response from the prosecutor. Logically, any response would involve the prosecutor explaining how he prepared J. and challenging the accusation that he had coached J. Even though the prosecutor's comments may have spilled over somewhat into a forbidden area, the departure from propriety was not substantial. The subject comments were brief and relatively isolated, particularly as compared to Santos-Herrera's trial counsel's comments vilifying the prosecutor.

In addition, any potential prejudicial effect from the prosecutor's comments that might be construed as inferring that the prosecutor vouched for J.'s credibility or referred to facts outside the evidence (i.e., how he prepared witnesses to testify) was minimized by the jury instruction that attorneys' arguments are not evidence.

21

Simply put, J.'s testimony and credibility were critical in this case. Santos-Herrera's trial counsel accused the prosecutor of coaching J. and trying to trick the jury. The prosecutor responded, explaining that he did not coach J. Under these circumstances, we conclude that "[w]hile we do not endorse the cited conduct, it did not render the trial fundamentally unfair. Nor did it amount to a deceptive or reprehensible method of persuasion. Accordingly, it did not constitute misconduct under federal or state standards."[5] (*People v. Gionis, supra,* 9 Cal.4th at pp. 1218-1219.)

## IV

### *DURESS*

Rodriguez[6] contends the trial court erred in its responses to the two jury requests for further clarification as to her duress defense. She alleges the court's responses to the inquiries about the severity and frequency under which she had to be under duress, did not sufficiently guide the jury's determination of her duress defense. She claims the court's ambiguous response that the duress had to exist "at the time the crime is committed" failed to specify whether the crime was her charged offense of child abuse for failing to protect R. or Morales's offenses against R. We disagree.

---

[5] Appellants also claim the prosecutor's alleged argument of facts not in evidence violated their rights under the confrontation clause of the United States Constitution. We are not persuaded. Appellants had opportunity to cross-examine J. during trial and ask about his pretrial meeting with the prosecutor. Indeed, they did so. We determine there was no violation of the confrontation clause.

[6] Morales and Santos-Herrera join the arguments in Rodriguez's brief that may accrue to their benefit. Because the duress defense did not apply to Morales or Santos-Herrera, we do not consider Rodriguez's arguments as to the other appellants.

22

## A. Background

The trial court instructed the jury on the defense of duress pursuant to CALCRIM No. 3402 [Duress or Threats]:

> "The defendant Crystal Rodriguez is not guilty of Child Abuse if she acted under duress. The defendant acted under duress if, because of threat or menace, she believed that her life would be in immediate danger if she refused a demand or request to commit the crime. The demand or request may have been express or implied.
>
> "The defendant's belief that her life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed.
>
> "A threat of future harm is not sufficient; the danger to life must have been immediate.
>
> "The People must prove beyond a reasonable doubt that the defendant did not act under duress. If the People have not met this burden, you must find the defendant not guilty of Child Abuse."

During deliberations, the jury submitted several questions to the court. The first and the third questions are not important to our analysis. Instead, we focus on the second question and the fourth question. Question No. 2 consisted of two parts: "1. Is it required that Crystal Rodriguez was under duress at every moment of every day for her to be not . . . guilty of PC 273a(a)? 2. Is the same required for the lesser charge of PC 273a(b)?"

In discussing this jury question, the prosecutor and Rodriguez's trial counsel agreed the answer to the second part of the question was "Yes."

23

The trial court asked Rodriguez's counsel how he wanted the court to answer the first part of the question. Rodriguez's counsel proposed the court answer "No" because nobody had any idea as to what time frame the jury was referring to. The attorney commented:

> "If you want to get on and on to where the answer goes, if they can identify when her supposed failure was, if they can identify that time frame or what specific event occurred that she omitted to act in conformity to the law, then they would have to determine did the duress exist at that point based on the totality of the evidence presented at trial, which answers the question they just asked no."

The prosecutor stated the question could not be answered with a simple "yes" or "no." The prosecutor then proffered: "Probably the correct answer is to say that to acquit her based on duress, the duress must apply at the time of the crime. So there must have been duress at any time she failed to act as required by the law."

Rodriguez's counsel responded, "If that's the answer, I want a unanimity specific instruction that they unanimously agree that whatever failure occurred there was no duress at that time." He also noted that the proposed answers were becoming more complex and beginning to lead the jury to some solution.

The trial court observed that neither party's response was "particularly good." The court proposed to inform the jury that it was declining to answer the question because the answer was too complex for a simple "yes" or "no" and that the jury would have to consider all of the evidence and apply the law as set forth in CALCRIM No. 3402. Rodriguez's attorney stated that he was not "terribly opposed to some fashioned answer like that."

24

While indicating his preferred answer would be to state that duress had to be present at the time of the crime, the prosecutor commented that he had no objection to the trial court's proposed answer. Rodriguez's attorney agreed with the prosecutor that duress had to be present at the time the crime was committed. Rodriguez's attorney also indicated he tended to agree with the court's proposed answer.

The trial court gave the following answer to the first part of Question No. 2: "The answer is too complicated to answer 'yes or no.' Please do analyze 3402 and decide if you need further instruction." Rodriguez's attorney commented, "That's good."

For the second part of Question No. 2, the trial court answered "Yes." Rodriguez's attorney did not take issue with the response.

Later in deliberations, the jury submitted Question No. 4, which also consisted of two parts: "1. If a defendant is intermittently under duress, will they [sic] still be guilty of PC 273a(a)? 2. We've discussed CC3402 for quite a while and are still not all clear about the severity and frequency of duress discussed in 3402."

The trial court noted that "[t]here is no such thing as frequency of duress." The court explained, "I think that's a false concept. I think duress has to be present at the time the crime is committed." Rodriguez's counsel added, "It's dangerous going much further than that."

Noting that the jury also used the word "intermittently" in its inquiry, the trial court stated that it was "not going to touch that." The court commented that the word "intermittent" is clearly different than the word "immediate" in CALCRIM No. 3402.

25

The trial court proposed to inform the jury that duress had to be present at the time the crime was committed. Rodriguez's attorney claimed the proposed answer shifted the prosecutor's burden to prove that Rodriguez was not acting under duress at the time of her offense. The court disagreed and stated that it was not removing any portion of the jury instruction or telling the jury to disregard any part of the instruction. The court also stated that it told the jury to analyze the evidence.

The trial court ultimately answered the question as follows: "The duress must exist at the time the crime is committed." Rodriguez's counsel's did not object.

B. Law and Analysis

Section 1138 provides in part: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given . . . ." Under that section, the trial court must " 'attempt "to clear up any instructional confusion expressed by the jury." ' " (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 128.) "When a jury asks a question after retiring for deliberation, '[s]ection 1138 imposes upon the [trial] court a duty to provide the jury with information the jury desires on points of law.' [Citation.] But '[t]his does not mean the [trial] court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' [Citation.] We review for an abuse of discretion any error under section 1138." (*People v. Eid* (2010) 187 Cal.App.4th 859, 881-882.)

26

In addition, "[w]hen the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 802 (*Dykes*).) At trial, Rodriguez's counsel agreed with the court's response to Question No. 2. On appeal, Rodriguez does not challenge the court's response to Question No. 2. Instead, she focuses on the response to Question No. 4.

Rodriguez asserts that the trial court's response to Question No. 4 left the jury with insufficient guidance to determine the viability of her duress defense. She claims that the phrase "at the time the crime occurred" left the jury to guess whether that phrase "referred to the crime with which [Rodriguez] was charged, i.e., her failure to protect R., or with respect to Morales' crime(s) against R." The People respond that Rodriguez forfeited this claim by failing to object at trial or ask for further clarification. Rodriguez counters that this court can consider the issue because the alleged error affects her substantive rights. (See § 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) The People have the better argument.

Rodriguez's only argument that the trial court improperly responded to the jury's question is that the response was ambiguous. She does not argue that the trial court's statement was not generally correct. As such, it is appropriate to apply the forfeiture rule to this issue. (See *Dykes*, *supra*, 46 Cal.4th at p. 802.)

27

Moreover, even if we were to review the issue on the merits, we are satisfied that the court did not abuse its discretion in answering Question No. 4. The answer was not ambiguous.

Question No. 4 indicated that the jury wanted clarification regarding when Rodriguez had to be under duress for the defense to apply. The instruction on duress provided the jury with an answer: "The defendant acted under duress if, because of threat or menace, she believed that her life would be in immediate danger if she refused a demand or request to commit the crime." In other words, the jury instruction made clear, that Rodriguez could not be convicted of child abuse, if at the time she committed the crime, she was acting under duress. The court's response to Question No. 4 simply echoed the jury instruction: "The duress must exist at the time the crime is committed." This is a correct statement of the law.

" 'Duress is an effective defense only when the actor responds to an immediate and imminent danger.' " (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1460 (*Hamlin*), quoting *People v. Heath* (1989) 207 Cal.App.3d 892, 900.) " 'A "phantasmagoria of future harm" such as a threat of death to be carried out at some undefined time, will not diminish criminal culpability.' " (*Hamlin*, *supra*, at p. 1460, quoting *People v. Petznick* (2003) 114 Cal.App.4th 663, 676-677.) Put differently, the duress defense requires the reasonable belief that threats to the defendant's life are imminent and immediate at the time the defendant's crime is committed. By responding that the duress must exist at the time the crime is committed, the trial court provided a correct, legal answer to the jury's question of whether a defendant would still be guilty if her duress was "intermittent."

Rodriguez was charged with child abuse likely to produce great bodily harm. The trial court properly instructed the jury as to that crime. Rodriguez's defense at trial was duress. The jury was properly instructed on duress, whereby it was instructed that "Rodriguez is not guilty of Child Abuse if she acted under duress." As such, the jury instructions clearly told the jury that the defense of duress applied to the crime charged against Rodriguez, not the crimes charged against any of the other defendants. "Jurors are presumed to be intelligent persons capable of understanding and correlating jury instructions." (*People v. Tatman* (1993) 20 Cal.App.4th 1, 11; accord *People v. Reliford* (2003) 29 Ca1.4th 1007, 1016.) On this record, we are satisfied the trial court did not abuse its discretion in responding to Question No. 4.

V

*CUMULATIVE ERROR*

Appellants also maintain the cumulative effect of the asserted errors rendered the trial so unfair as to violate their federal and state constitutional rights to due process warranting reversal of the judgment. We have rejected appellants' claims of error. Because we hold no errors exist, this cumulative error argument necessarily fails. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [no cumulative effect of errors when no error]; *People v. Butler* (2009) 46 Cal.4th 847, 885 [rejecting cumulative effect claim when court found "no substantial error in any respect"].)

29

*ORDERS PROHIBITING VISITATION*

Appellants[7] claim the section 1202.05 orders prohibiting any visitation between Morales or Santos-Herrera on the one hand and J. or R. on the other is unauthorized and must be stricken. They argue that none of their convictions are for any of the offenses listed in section 1202.05. We agree.

"A claim that a sentence is unauthorized . . . may be raised for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court." (*People v. Dotson* (1997) 16 Ca1.4th 547, 554, fn. 6.) A sentence is generally unauthorized where it could not lawfully be imposed under any circumstance in the particular case. Appellate courts are willing to intervene in the first instance because such error is clear and correctable independent of any factual issues presented by the record at sentencing. (*People v. Scott* (1994) 9 Ca1.4th 331, 354.)

The propriety of a no-visitation order is determined by the authorizing statute. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 996 (*Robertson*).) Section 1202.05, subdivision (a), provides that when a defendant is sentenced to prison for violating certain enumerated statutes and a victim is under the age of 18, the court shall enter an order prohibiting all visitation between the defendant and the victim. The plain language

---

7    Rodriguez joins in the arguments that are raised in Morales's and Santos-Herrera's briefs and may accrue to her benefit. Because the trial court did not order that any visitation between Rodriguez and J. or R. be prohibited pursuant to section 1202.05, we do not include Rodriguez for purposes of our analysis of the orders prohibiting visitation.

of section 1202.05 "includes only child victims of offenses for which a defendant was sentenced to prison." (*People v. Ochoa* (2011) 192 Cal.App.4th 562, 564.)

Here, the trial court ordered that any visitation between Morales or Santos-Herrera and J. or R. be prohibited pursuant to section 1202.05. Morales was convicted of torturing J. and R. in violation of sections 206, inflicting corporal injury upon J. and R. in violation of section 273d, and sodomizing J. in violation of section 288.7. Santos-Herrera was convicted of torturing and sodomizing J. in violation of sections 206 and 288.7. None of these convictions are for any of the offenses listed in section 1202.05, subdivision (a). Accordingly, section 1202.05 does not provide authority for the no-visitation orders issued by the court. The orders thus are stricken. (See *Robertson*, *supra*, 208 Cal.App.4th at pp. 996-997.)

DISPOSITION

The orders prohibiting Morales or Santos-Herrera from visiting with J. or R. are stricken. The superior court is directed to amend the abstracts of judgment to reflect the striking of these orders and to forward the amended abstracts of judgment to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

                                                    HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


AARON, J.